ADMINISTRATIVE DUE PROCESS PROCEEDING
BEFORE AN INDEPENDENT HEARING OFFICER
APPOINTED BY THE INDIANA DEPARTMENT OF EDUCATION
PURSUANT TO 511 IAC 7-45-3 et seq.

RECEIVED

NOV 27 2018

Office of Special Education

IN THE MATTER OF: K.W. by Next Friends )
                         Petitioners )
                                         )

And )   HEARING NO:

                                         )
Metropolitan School District of Warren County and )
Wabash River Valley Special Education Co-operative )
         Respondents. )

## COMPLAINT AND REQUEST FOR DUE PROCESS HEARING

This action is brought under the Individuals with Disabilities Education Act, 20 U.S.C. §

1400 et seq., as amended (IDEA) and 511 IAC 7-45-3. Petitioner, by counsel, Catherine Michael

and Thomas Blessing, respectfully requests the appointment of an independent hearing officer

and a closed hearing to address certain violations of Petitioner's rights occurring within 2 years

of when Petitioner knew about the violations. In support of this Request, Petitioner states:

## SUMMARY BACKGROUND AND DESCRIPTION OF PROBLEMS

1. Petitioner,            ("K.W.") is a 3rd grade student who resides with his parents

                                           in Williamsport, Indiana 47993.

   He is 8 years old and was born on

2. The student is currently attending his home school, Williamsport Elementary School.

Williamsport Elementary School is owned and operated by the Metropolitan School

District of Warren County ("School"), whose address is 101 N Monroe Street,

Williamsport, IN 47993-1140.



Exhibit

A

3.  MSD or Warren County contracts with Wabash River Valley Special Services Cooperative ("Coop"), to oversee and provide special education services. Wabash River Valley Special Services Cooperative is located in Covington, Indiana.

12. K.W. is a young man who has a long history of academic and emotional struggles. He has been diagnosed with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, Bipolar Disorder, and Autism Spectrum Disorder. He has sensory issues and anxiety and a documented strong family history of anxiety, depression, and learning disabilities. Half way through his kindergarten year, K.W. was identified as in need of special education and related services as having an Other Health Impairment, presumedly due to his diagnosis of Attention Deficit Hyperactivity Disorder and the school developed his first Individualized Education Plan at that time.

4.  K.W.'s history includes aggressive behavior at home and at school, which worsens when he is physically restrained. He has difficulty paying attention to tasks or activities, following directions, following through on instructions, is easily distracted, and has difficulty with sleeping. Over the course of the last several years, his parents have attempted to medically treat his behavior problems and Attention Deficit Hyperactivity Disorder symptoms. He has been prescribed a variety of psychotropic medications, including Adderall, Abilify, Zoloft, risperidone, Dexatroamphetamine-Ambaphetamine, Aripipazone, Sertraline, and Melatonin and none have been very successful. He has also taken Intuniv, methylphenidate, and Strattara, all of which he became allergic. At age 6, he was admitted as a psychiatric inpatient at Valle Vista for treatment to reduce his aggressive behavior. His behavior temporarily improved, but there were no long-term benefits from the treatment.

5.  K.W. has difficulties with reading, writing, and written language. He has been involved in Title 1 Reading intervention, Sunform, Sidewalks, iStation, Reading Horizons, iReady, and "Tiered Reading," which apparently is what the school calls its Response to Intervention program.

6.  Despite his struggles, K.W. has strengths in math and science. He loves animals, especially dinosaurs, and loves sharing this knowledge with his peers and teacher.

### 2016-2017 School Year – 1st Grade

7.  On August 2, 2016, K.W. was evaluated by the Riley Child and Adolescent Psychiatry Clinic. That evaluation determined he did not meet the criteria to be diagnosed with Autism Spectrum Disorder or bipolar disorder. He did meet the criteria for Oppositional Defiant Disorder and Attention Deficit Hyperactivity Disorder and the evaluation recommended the school develop a Functional Behavioral Analysis and implement a Behavior Intervention Plan, based on the results of the Functional Behavioral Analysis, with antecedent management or prevention of problem behaviors.

8.  On October 11, 2016, the Case Conference Committee met to review and revise the Individualized Education Plan. The Plan notes he continues to struggle with reading comprehension due to non-mastery of foundation skills in reading, despite being provided with 30 minutes of "tier" time during the previous school year and is performing below grade level in Math and Reading. The parents expressed concern regarding K.W.'s behavioral and academic skills.

9.  The school elected to assess K.W.'s reading with Istation, a computerized e-learning tool. On this tool, he scored at grade level on overall reading, letter knowledge,

phonemic awareness and vocabulary, below grade level in comprehension, and seriously below grade level in spelling and alphabetic decoding. It is unknown how far behind K.W. was when compared with Indiana's state standards, since Istation has never been correlated with its standards.

10. K.W.'s The Individualized Education Plan contains a total of four goals: (1) Social Skills; (2) Physical Contact; (3) Sight Words; and, (4) Long Vowel Decoding. None of the goals include Present Levels that provide a good baseline to measure progress, and none of the goal statements are measurable. Further, none of the goals provide effective strategies that will allow K.G. to make adequate progress toward the goals. The Individualized Education Plan provides for 30 minutes a day of RTI tiered instruction for English Language Arts, 30 minutes a day of RTI tiered instruction for math strategies, 15 minutes a day of small group station work in the general education environment, and 25 minutes a day of computer based tiered reading remediation in the special education setting. The Individualized Education Plan calls for no Assistive Technology, to Extended School Year, and no specific instruction for Social Skills, although the Individualized Education Plan notes he is, "struggling primarily with social skills."

11. At the end of the semester grading period, the student's teacher stated on his report card the student's "sight word recognition is very poor which greatly effects (sic) his reading ability.

13. The Case Conference Committee met on May 24, 2017. A full Individualized Education Plan for that date is not available at the time of this Complaint, but the "IEP at a Glance" states the only behaviors of concern at that time were tattling, running in the hallway,

4

being physically aggressive with other students or himself, and touching others in the hallway, classroom, specials, and recess. The school appeared to believe these behaviors were to gain attention or to escape/avoid tasks. There were no change in the goals or special education services from the October 17, 2017 Individualized Education Plan, but the Plan notes that a Functional Behavioral Analysis was being completed.

14. On May 26, 2017, K.W. was evaluated by Meridian Psychological Associates. His scores on each Index of the Weschler Intelligence Scale for Children - 5th Edition fell in the high average range at the 79th percentile except for his Processing Speed Index, which fell in the average range at the 63rd percentile. The evaluator noted that although his intellectual capacity is above average, his emotional functioning impacts his ability to appropriately use his intellect to assist him. She opined that part of the reason for his behavioral difficulties was due to his undeveloped internal organization structure, making him rely heavily on the external environment for control and mastery. When he is unable to control his environment, he acts out impulsively and aggressively. She also noted his difficulty with verbal and non-verbal communication to initiate, engage in, and maintain social contacts. She summarized K.W.'s difficulties to be due to a lack of mastery in significant developmental tasks and recommended the school provided a Functional Behavioral Analysis and Behavior Intervention Plan, accommodations, a social skills training program. She performed no academic measures.

15. At the end of the school year on the student's report card, his teacher predicted that, "second grade will become more challenging because of the standards."

## 2017-2018 School Year – 2nd Grade

5

16. In August 2017, the school notified the parents K.W. had failed the iReady Math and Reading tests.

17. On September 1, 2017, the school's Occupational Therapist evaluated K.W. The Therapist noted he walked and ran with "heavy feet," possibly seeking proprioceptive input. During her classroom observation, the Therapist noted K.W. was having trouble transitioning from one task to another. He became aggressive and two members of school staff restrained him for about 15 minutes, after which they moved him to the special education classroom. The Therapist noted again that K.W. appeared seek proprioceptive input and pressure from the restraint to calm himself. Her Occupational Therapy report indicates no hands-on assessment or evaluation. She failed to assess K.W.'s ability to coordinate his eyes, arms, hands, pencil grip, letter formation, and body posture in order to be able to produce handwriting effectively and efficiently. She failed to evaluate the underlying components that support a student's handwriting, such as muscle strength, endurance, coordination, and motor control. Because her report was incomplete and substandard, it failed to evaluate all areas of the student's suspected disability. The recommendations in her report include only items to address K.W.'s sensory issues.

18. On August 28, 2017, the Case Conference Committee met to review K.W.'s increasing aggressive behaviors that the school was not able to manage effectively. The Individualized Education Plan from that date includes no new services, recommendations, or specialized instruction. The school declined to bring in a BCBA or behavior analyst or to create a new FBA to look at the antecedents and other causes to the escalating behavior.

6

19. By October 5, 2017, K.W. had accumulated 14 discipline referrals for damaging property, physical aggression, and refusal to cooperate.

20. On October 18, 2017 the Case Conference Committee met for K.W.'s Annual Case Review and to review the reevaluation information. At that time, his I-Ready Reading testing results indicated his overall progress and phonics progress were at the 1st grade level, leaving him one grade level below his peers. He had also regressed from the previous I-Ready assessment in Literature and Informational Comprehension and continued to be two grade levels behind his peers in High-Frequency Words and Vocabulary.

21. On the I-Ready Math results, overall, he made little progress and was two grade levels behind his peers in Numbers and Operations, Algebra and Algebraic Thinking, and Geometry. He was nearly at grade level only in the area of Measurement and Data.

22. K.W.'s results on the STAR Reading test indicated he was performing at the Pre-Primer (PP) level, over 2 years below his peers.

23. K.W.'s Individualized Education Plan developed on October 18, 2017 refers to out-of-date cognitive ability and academic achievement test results and the "Notes" section, states the Occupational Therapist was recommending only Consultation services. The Individualized Education Plan also failed to include any results from the Weschler Intelligence Scale for Children - 5th Edition from the Independent Education Evaluation administered on May 26, 2017, instead choosing to rely on outdated evaluation data from October 2015.

7

24. The Individualized Education Plan fails completely to offer any discussion, special instruction, or goals related to any academic area other than goals for Decoding and Sight Words. The Goals for Sight Words and Decoding are aligned to the 4th grade level, despite the Present Levels for each of those Goals being at the Kindergarten to 1st grade level.

25. The Individualized Education Plan fails to include goals for Phonics, Comprehension, Numbers and Operations, Algebra and Algebraic Thinking, or Geometry, despite K.W. performing between one and two grade levels below his peers.

26. The Individualized Education Plan includes a Goal for Social Skills and Physical Contact, but the Present Levels for each are unmeasurable and use vague terms such as, "often," "sometimes," "doesn't always," "a weakness," "struggles with," "occasionally," and "far less." Such terms in the Present Levels do not allow an independent observer to be able to determine whether the student is progressing toward the goal, nor do the goals provide an independent way to measure progress.

27. Despite K.W.'s lack of progress and academic regression, the Case Conference Committee did not increase his level of special education services. In fact, his Individualized Education Plan calls for *no* academic instruction from a special education teacher. For the third year in a row, he was placed in a general education Response to Intervention program with no increase in the amount of services from the previous year. The only special education services in his Individualized Education Plan are 20 minutes a day to participate in a check-in, check-out program for behavioral concerns and a scheduled break for stress relief and anger management purposes, neither of which

8

provided any special instruction from a special education teacher. The Individualized Education Plan "Notes" section refers to K.W. attending school only for half days.

28. While there was discussion about instituting half-days, the Individualized Education Plan is unclear as to whether K.W. attended full or half days. If he did attend half days, as the Individualized Education Plan would lead one to believe, it would have been impossible for the school to implement the services in his Individualized Education Plan.

29. The Individualized Education Plan provides for only 30 minutes of Occupational Therapy consultation every nine weeks (3.33 minutes a week), and those services were only to address K.W.'s sensory processing problems. The Individualized Education Plan provided no direct therapy or further evaluation to address the gross motor observations the Occupational Therapist noted in her report.

30. The Individualized Education Plan provides no Assistive Technology services, no Extended School Year services, and no recommendation for further evaluation despite his increasing behavior problems.

31. The Case Conference Committee blamed K.W.'s Attention Deficit Hyperactivity Disorder for his academic problems, when it should have addressed the academic problems with appropriate special instruction, regardless of the reason for them.

32. Despite not recommending further evaluation at the most recent Case Conference, the school did reevaluate K.W. during December 2017 and January 2018. The evaluator terminated the second testing day after 10 minutes when K.W. expressed he was tired and had difficulty keeping his eyes open.

9

33. In the report, the evaluator noted K.W. struggled with word decoding, fluency, and
reading tasks, but echoed the opinion of the school, that the fluency problems were due
to off-task behavior. The evaluator failed to consider the possibility of processing
problems, Specific Learning Disabilities, or writing problems.

34. The evaluator did no intellectual testing, choosing instead to adopt those results from the
July 2017 Independent Education Evaluation. The Kaufman Test of Educational
Achievement III results showed K.W.'s Letter and Word Recognition, Reading Fluency,
and Written Expression at the fifth, fourth, and fourth percentiles, all nearly 2 Standard
Deviations below the mean and Math Fluency at the 8th percentile, over 1 ½ Standard
Deviations below the mean. The achievement scores are significantly discrepant when
compared to his IQ scores, which are in the high average to above average range.

35. The evaluator noted K.W. struggled to decode or use phonetic principals to sound out
unfamiliar words, but did not consider whether the student has Dyslexia or another
Specific Learning Disability. The inability to decode and use phonetic principals affects
the student's ability to read and his ability to comprehend what he reads.

36. Rather than look at the possibility of a Specific Learning Disability and recommend
specialized instruction for that, the evaluator based his opinion on the behavior rating
scales results and he opined K.W. met the criteria of an Emotional Disability.

37. Despite not finding the student met the criteria for an Specific Learning Disability, the
evaluator recommended reading remediation in a 1-on-1 setting, small group setting for
core instruction in Reading, Math, and Science, Coping, Social Skills support and Anger
Management strategies, a "Hot Pass" system, a home schedule for time management,

organization, and self-regulation, and a timer to allow him to become more self-sufficient. No Individualized Education Plans developed from this evaluation included most of these recommendations.

38. On December 11, 2017, the Case Conference Committee met to revise K.W.'s Individualized Education Plan and proposed a shortened school day. The parents agreed to try that out, but expressed concern that the student would miss specials and recess. The Case Conference Committee attempted to fit in library, since that was a special of particular interest to K.W. The Individualized Education Plan notes the parents stated they were trying to get the student into a behavioral center in Indianapolis, but that could take up to two months. No changes were made to K.W.'s Goals or to his Special Education Services.

39. At the end of the first semester, the teacher's report card notes state, "Math has challenged [the student] this past nine weeks ... he does seem to struggle with subtraction ... he lacks confidence when it comes to subtractions. I definitely feel half days have helped him be more successful ... he is currently reading at a 1.2 [first grade, second month] level ... finds academic vocabulary and comprehension for literature and informational test challenging."

40. On January 17, 2018, the Case Conference Committee met and discussed the Functional Behavioral Analysis. The Committee determined K.W. needed sensory breaks, a reward system, 3 safe passes to use when he feels anxious or upset, a bean bag chair, sensory fidgets, and weighted objects. His Individualized Education Plan Goals for reading Sight Words and Reading Decoding were not changed and no other academic Goals were

added, despite K.W.'s low scores on the K-TEA in Letter Word Recognition, Reading

Fluency, Math Fluency, and Written Expression and the school's own evaluator's

recommendations. There were no changes made to the amount of services or special

education instruction in the Individualized Education Plan, no recommendations for

Assistive Technology services, Extended School Year services, nor did the student's

special education services increase in any way.

41. At that point, the Individualized Education Plan provided for almost exclusively general

education Response to Intervention services. The only special education instruction the

student was to receive was 30 minutes, 4 times a week social skills training. Since he

was receiving only a half day instruction, it is unlikely the school was able to provide

the full complement of the meager special services and support supplied in his

Individualized Education Plan. The justification for the shortened school day was due to

his behavior and to allow him more time to sleep.

42. On March 8, 2018 the Individualized Education Plan was revised without a Case

Conference Committee meeting. At that time, the student had 28 reported behavior

issues since Dec. 8th, and 42 reported behavior issues for the school year, despite the fact

he was attending school only ½ days.

43. I-Ready test results indicated he had made no progress in overall reading, had regressed

in vocabulary, Literature and Informational Comprehension, and had progressed

minimally in Phonics and High Frequency Words. He was still two grade levels below

his peers.

44. Math I-Ready scores showed slight progress overall, and slight progress in Numbers and Operations, Measurement and Data, Geometry, Algebra and Algebraic Thinking. However, made no progress and was below grade level in Algebra and Algebraic Thinking.

45. STAR reading testing shows minimal progress, but he was still at the Pre-Primer (Kindergarten) level and two years behind his peers.

46. Despite the lack of academic progress, the failure of the Behavior Intervention Plan, and his behavior continuing despite the shortened school day, the Case Conference Committee made no significant changes were made to the student's Individualized Education Plan.

47. On April 17, 2018, the Case Conference Committee again reviewed the student's Individualized Education Plan. The school informed the parent that it would be charging the parents for property damage incurred by the student, the parents' InSource advocate stated the parents did not have to pay for damages due to something in Article 7. The parent signed consent to have the school contact the Indianapolis private behaviorist for the student.

48. The school proposed moving K.W. from half days of instruction to Homebound. The InSource Advocate asked the school to consider a one-to-one paraprofessional, but the school responded that a one-on-one would be "stressful" to K.W. The school stated the Homebound services would eliminate his stressors and focus on academics to get him caught up and finish his Accelerated Reader program, and that the plan was to return the student to full days at the beginning of the 2018-2019 school year. The parents disagreed

13

with the school's Homebound proposal but agreed to go to mediation to attempt to resolve their differences of opinion. They also made a written request to view the video of the April 11, 2018 incident that had caused the Case Conference Committee to convene.

49. On May 4, 2018, the school sent the parents a notice of alleged damages over $50 accumulated through the year as a result of the student's behavior and that the next school year, the parents would be expected to pay for damages monthly. The school generously offered to allow the parents to arrange to make payments for the damaged items and to bill on a more frequent basis upon request.

50. On the student's report card, at the end of the year, his teacher noted he, "is performing below grade level in reading and could continue to use some extra support." She provided the parents with things they could do to assist the student at home but recommended no additional school services or academic support.

### 2018-2019 School Year – 3rd Grade

51. On August 3, 2018 the Case Conference Committee met to review the student's Individualized Education Plan. No changes were made to his Goals or the amount of services provided. In fact, K.W.'s academic Goals and Special Education Services are identical to those in his previous Individualized Education Plan.

52. At that meeting the school informed the parents they would receive a bill for all damages at or over $50 that are incurred due to K.W.'s behavior this school year. The school provided no rationale on how this policy would improve K.W.'s behavior and the threat to charge the parents appeared to be an intimidation attempt.

14

53. On August 15, 2018, the student had behavior incidents during Physical Education and in the classroom. The school called the parent to pick up the student because of a meltdown that allegedly caused damage to workbooks, library books, 3 classroom chairs, a Science curriculum kit, and 4 station bins.

54. On August 27, 2018, the student began throwing objects in the classroom, allegedly damaging 4 book baskets and a classroom globe.

55. On August 31, 2018, the parents received a letter from the school's attorney alleging the student had damaged $873.77 worth of school property and demanding reimbursement for the damages due to an "agreement to reimburse the school for any damages caused by [the student's] outbursts." The parents deny making any such agreement.

56. On August 24, 2018, the school sent a statement for damages to school equipment allegedly caused by the student's outburst on August 15, 2018. The total billed to the parents was $873.77.

57. On September 5, 2018, the parents received a statement for damages allegedly caused by the student in the amount of $323.39. The school generously removed a line item for the classroom globe due to its age.

58. On September 12, 2018, at approximately 1:15 p.m., the school contacted the parent to pick up the student. There were no allegations of damage to school property in the school's report to the parents.

59. On September 17, 2018, shortly after lunch, the student had a meltdown that resulted in the teacher calling the School Resource Officer. The student allegedly damaged an iPad,

15

an iPad case, a Clever Touch TV, 2 classroom chairs, a teacher cart with drawers, stackable trays, game boards, and teacher office supplies. He was physically restrained by two school staff members for approximately 3 minutes. When the school contacted the parent to pick the student up, she was unable to secure transportation to do so and at 1:30 p.m., school staff transported the student to his home. The restraint documentation noted the student's "extreme fidgety" behavior and "involuntary behaviors" and encouraged the parents to discuss these behaviors with the student's doctor. However, the school failed to notify the parent that this was a recommendation for a medical evaluation and the school was responsible for paying for the evaluation.

60. On September 20, 2018, the student arrived at school extremely tired. School staff took him to the nurse's office where he slept until school staff woke him up at 11:40 p.m. Learning he had missed recess the student had a meltdown and began throwing objects in the nurse's office. The school called the parent to pick him up at 12:50 p.m. The school alleged the student damaged an ice generator, a wireless mouse, a computer power box chord (sic).

61. On September 19, 2018, the parents received an itemized statement from the school for alleged damages to property caused by the student. The total amount they were asked to pay was $4,421.56. The statement failed to include any claims made to or paid by the school's insurance company, nor did it include whether the school had any deductible, which would have brought the total amount of damages down.

62. On September 21, 2018, the parents received another letter from the school's attorney demanding payment for damages totaling $4,421.56 allegedly caused by the student to school property.

63. On October 1, 2018, around 9:30 a.m., the student became agitated in the hallway after Physical Education. He deescalated without causing any damage to school property and without the need for physical restraint. At 10:15, he again became agitated and began throwing objects. School staff removed the other students from the classroom. When the student learned he had missed most of recess he had another meltdown but calmed down after about 15 minutes without the need for restraints.

64. As of October 1, 2018, the school utilized the STAR reading assessment for the student's Annual Progress Report and found he had regressed. He was performing at the 7th percentile in reading and his instructional reading level was at the kindergarten level, over two years below his peers.

65. On October 15, 2018, according to results on the I-Ready testing, he was below grade level in all areas of math performance and phonological awareness, needed improvement on vocabulary and literature comprehension. Overall, he was below grade level in all areas of reading.

66. On December 11, 2017, K.W.'s family physician wrote a letter to the elementary school principal recommending an Aid (sic) to assist [the student] daily to help those who teach and care for him at school.

67. The discipline reports for the student's behavior incidents are not helpful because they fail to include what the student was being asked to do when the meltdowns occurred.

Several mention he was in Mathematics, some were in unstructured times such as recess, lunch, in the hall, but others are non-specific and thus unhelpful in determining the antecedent to the behavior. On one report dated May 3, 2018, the classroom teacher was apparently able to read the student's mind, because she stated he got frustrated while "still thinking about the AR incentive."

68. The School has never fully evaluated K.W. in all areas of his suspected disabilities. It has never evaluated him for speech/language problems, including difficulty with pragmatic language. It has also never fully evaluated him for functional academic problems, including all seven areas of reading, spelling, written language, and functional mathematics.

69. The school has never provided the student with a complete and adequate psychoeducational evaluation to determine whether his academic struggles are due to a Specific Learning Disability in the areas of reading, mathematics, and written language, nor has it looked at the status of his ability to process information in verbal, visual, and written form. It has not determined the status of his anger and impulse control issues.

70. The student is not, and has not for a prolonged period of time, received a full educational day when compared with his peers. He is currently receiving less than three hours of day of educational services and as a result, his academic performance continues to regress. Further, the reasons provided by the school for the shortened school day was to reduce stress and prevent behavior problems. That, as well, as been an abject failure.

71. Neither Williamsport Elementary School nor MSD of Warren County provides any user-friendly information regarding special education for parents to access on their individual

websites. Wabash River Valley Special Education Cooperative does not have a website or contact information available anywhere reasonably accessible to parents. Therefore, the parents have been deprived of information on when, where, and how to seek assistance and educational services for their child.

72. The school has placed the student nearly full time in the general education room with extremely limited time in a special education classroom for academic instruction, despite his parents' continual expressions of concerns about his academic achievement. When his parents asked for a one-on-one paraprofessional to assist with behavior the school told them a one-on-one aide was not necessary.

73. As the student moved into 2nd and 3rd grade, the academic expectations and demands became greater. It should have been no surprise to the school that he would become increasingly frustrated and angry at the increased academic requirements that were beyond his reach without specially designed instruction in a special education classroom. As could be expected, his behaviors have become significantly aggressive. Despite this, the school conducted no updated Functional Behavioral Analysis, nor did it attempt to revise his Behavior Intervention Plan despite multiple daily and repeated behavioral outbursts leading to exclusions from school, a shortened school day, and possible monetary damages to the parents.

74. The student was excluded from school several times during his 3rd grade year. He did not receive a full school day for approximately a semester, during his 2nd grade year.

19

75. His Individualized Education Plan Goals from year to year are nearly identical. His special education services are virtually non-existent. His behavior has spiraled out of control and he is regressing academically.

76. The school has consistently listed the following as behaviors of concern: off task behaviors, touching others, talking, not following directions. Yet, the school never created any type of baseline chart, never indicated how often these behaviors were occurring, nor did it ever adequately address the issues.

77. The goals in the student's Individualized Education Plan are unmeasurable, inappropriate and not achievable, given the student cannot read above a 2nd grade level and he is receiving inadequate special education and special instruction to progress toward those goals, even if they were appropriate.

78. The student's current Individualized Education Plan includes reading goals only for Decoding and Sight Words. He has no phonemic awareness, phonics, comprehension, fluency goals, or otherwise despite the fact he is reading over 2 years behind his peers.

79. The student's Individualized Education Plans have never included mathematics goals, despite his ongoing struggles in that academic area.

80. The school never provided the student with social work services, home training, specialized instruction, Assistive Technology services, books on tape, tutoring or one on one services.

81. The school has never provided Extended School Year services to the student at any time during his school career, despite the fact its own testing instruments clearly show his propensity for regression.

82. The Case Conference Committee informed the parents the school was shortening the students school day for the second semester of the 2017-2018 school year and, as a result, he has received only 3 hours a day of instructional services for this entire school year.

83. The student's progress monitoring is nearly identical to that found on his previous Individualized Education Plans, including some progress data being more than 2 ½ years old.

84. None of the special education services offered to the student in his Individualized Education Plans were instructional in nature. They can be described as only supplemental aids and services.

85. In order to help the school better serve their child the parents have sought out and paid for private therapeutic counseling, private evaluations, and a behavior consultant.

86. On different occasions, the parents have requested from the school assistance, academic special education instruction, one on one aides, a full school day, homework assistance and many other items from the school system over the past three years. Their requests have fallen on deaf ears. The parents believe that the intervention of an Independent Hearing Officer from the State is necessary to insure their child will learn to read, write, do mathematics, be able to have relationships with peers and adults, and be a successful,

independent adult. They believe they have no other option than to file this due process complaint and seek relief.

## LEGAL ISSUES BEFORE THE IHO

87. Petitioner submits his issues for hearing and proposed remedies in writing and include the following issues and remedies under the Individuals with Disabilities Education Act and Article 7.   The major issue for hearing is whether Respondent failed to devise appropriate IEPs for the student that met the requirements of Article 7 and the IDEA resulting in a denial of a free appropriate public education (FAPE) and harm to the student, significantly impeding the student's and parents' opportunity to participate in the decision-making process and/or causing a deprivation of educational benefits.  This issue applies to the entire statutory period of two years prior to the date of this request. The sub-issues within the over-riding issue of denial of FAPE include:

   a. Whether the Respondent failed to develop IEPs covering all areas of the student's need, including the student's placement, measurable goals, necessary accommodations, special education and related services reasonably calculated to provide meaningful educational benefit and, if not, whether this denied the student FAPE in accordance with but not limited to 511 IAC 7-32-48, 511 IAC 7-46-6; 511 IAC 7-32-40; 511 IAC 7-40-4, 511 IAC 7-40-8, 511 IAC 7-42-4, and 511 IAC 7-42-7, 511 IAC 7-32-36 as well as the relevant portions of IDEA and case law; and if so, whether this denied the student FAPE.

   b. Whether Respondent should have offered and provided related services including occupational therapy, physical therapy, therapeutic counseling, medical evaluation services, social work services, home training for the parents, wrap

22

around services and other necessary services to create an appropriate program given the Petitioner's needs in accordance with but not limited to 511 IAC 7-32-79; 511 IAC 7-43-1; as well as the relevant portions of IDEA and case law; and if so, whether this denied the student FAPE.

c.  Whether Respondent properly advised the parents about the continuum of available services in accordance with 511 IAC 7-42-10(4)(D)-(E) as well as the relevant portions of IDEA and case law; and if so, whether this denied the student FAPE.

d.  Whether Respondent provided accurate and true progress reports at least as often as other students received grade reports in accordance but not limited to 511 IAC 7-42-6 as well as the relevant portions of IDEA and case law; and if so, whether this denied the student FAPE.

e.  Whether Respondent provided and developed an appropriate and timely Functional Behavior Assessment, as well as developed and implemented an appropriate and timely Behavior Intervention Plan in accordance with but not limited to 511 IAC 7-32-10, 511 IAC 7-32-41, 511 IAC 7-41-7(3), 511 IAC 7-44-5, 511 IAC 7-32-6, 511 IAC 7-42-6, 511 IAC 7-43-1 as well as the relevant portions of IDEA and case law; and if so, whether this denied the student FAPE.

f.  Whether the Respondent educated the student is the Least Restrictive Environment when he was placed on shortened days in accordance with but not limited to 511 IAC 7-42-6(9), 511 IAC 7-42-10, 511 IAC 7-42-11 as well as the relevant portions of IDEA and case law; and if so, whether this denied the student FAPE.

g.  Whether Respondent properly monitored the student's progress on goals and provided the parent with progress reports at least as often as nondisabled students. 511 IAC 7-42-6(f)(3).

h.  Whether Respondent, failed to appropriately train teachers and staff who were working with the student in accordance with but not limited to 511 IAC 7-42-1, IDEA and relevant case law; and whether this denied the student FAPE;

i.  Whether Respondent afforded the parents the opportunity to participate meaningfully in a case conference and, if not, whether this denied the student FAPE in accordance with but not limited to 511 IAC 7-42-2; 511 IAC 7-42-; 511 IAC 7-42-5 511 IAC 7-37-1 and 511 IAC 7- 42-6; as well as the relevant provisions of IDEA and case law;

j.  Whether Respondent should have conducted a re-evaluation of the student. 511 IAC 7-40-3(e) and (f); 511 IAC 7-40-8; 34 CFR §§ 300.304-300.311.

k.  Whether Respondent provided the parents with prior written notice when changing the student's placement, refusing her requests for services and medical evaluations, in accordance with but not limited to 511 IAC 7-42-7, 511 IAC 7-37-1 pursuant to the relevant provisions of Article 7 and IDEA;

l.  Whether the parents are entitled to reimbursement for all special education and related services, including transportation to and from school, therapeutic counseling, medical evaluations, and any and all other services the school was mandated to provide and failed to do so.

m. Other issues as discovered once a full records review occurs.

**REMEDIES REQUESTED**

24

88. To assist the trier of fact determining the appropriate remedies for the student, the family requests the following, reserving the right to amend this list of proposed remedies based on the recommendations from their professional advisers. IDEA states that the complaint should contain a proposed resolution of the problem "to the extent known and available to the party at the time." 34 C.F.R. § 300.508(b)(6).

    a. Respondent will provide the student with an appropriate IEP and appropriate private services to remediate the student's deficiencies in reading and mathematics in an environment that is appropriate for his needs and that complies with all the procedural and substantive requirements of the IDEA and Indiana special education laws. Included in this general request could be the following, plus anything else that the hearing officer deems to be appropriate.

    b. Respondent will pay for a functional behavior assessment (FBA) conducted by an independent evaluator chosen by the parent. This will include development of a behavior intervention plan (BIP) for the student. Respondent will pay for the FBA evaluator to participate in a case conference and train the parent and school staff who work with the student on the BIP to ensure its implementation with fidelity across settings.

    c. Respondent will provide the student with a 1:1 aide.

    d. Respondent will reimburse the parents for out of pocket therapy and tutoring expenses.

25

e. Respondent will remove all monetary "charges" and will not ask the parent's to reimburse for damages. In the event that the student is unable to be maintained without damage to his classroom Respondent will be ordered to have a case conference to look at therapeutic day placements and other available services and placements.

f. Respondent will admit denying the student FAPE or, in the alternative, a finding that Respondent denied the student FAPE.

g. Respondent will admit failing to provide the parent prior written notice of its refusal(s) to take action or provide services or, in the alternative, a finding that Respondent failed to provide the parent prior written notice of its refusal(s) to take action or provide services.

h. Respondent will admit that it failed to inform the parent of the continuum of placements available or, in the alternative, a finding that Respondent failed to inform the parent of the continuum of placements available.

i. Respondent will admit that its staff were not properly trained or, in the alternative, a finding that Respondent's staff were not properly trained.

j. The School will conduct a half-day training session for teachers and staff members who work with the student for the fall and spring semesters of this school year, once each semester, for teachers and staff regarding the issues raised in the case. A copy of the attendance sheets and any fliers or written materials produced for these trainings will be provided to the parents within 10 days of the trainings.

k. The school will provide compensatory education in the number of hours deemed appropriate by the IHO based on the testimony of providers.

l. The school will provide the parent reimbursement for all the special education and related services they have provided, including, but not limited to, therapeutic counseling, transportation, and the Independent Educational Evaluation.

m. The school will provide individual therapeutic counseling, social work services, occupational therapy, and any other services the IHO finds appropriate in the amount he or she deems suitable.

89. The family also requests that the hearing officer determine that the child was denied the right to a Free Appropriate Public Education (FAPE) or, alternatively, that the district concede this point in settlement.

90. The family requests any and all remedies available to them, pursuant to case law, statute and equity. The IDEA expressly gives broad authority for hearing officers and courts to order appropriate remedies, without regard to whether the family specifically mentions each and every possible remedy that might be deemed appropriate by a hearing officer. "[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell v. Hood*, 327 U.S. 678, 684 (1946), and the existence of a statutory right implies the existence of all necessary and appropriate remedies. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239 (1969) (citations omitted).

27

91. As part of the resolutions requested in this matter, the family is also putting the school on notice that it will seek reimbursement of expert witness fees through the ADA, which clearly authorizes reimbursement for plaintiffs' litigation expenses, including expert fees.[1]

92. The ADA authorizes a court to award attorney's fees, litigation expenses, and costs to a prevailing party. *See* 42 U.S.C. § 12205 and 28 C.F.R. § 35.175. The preamble to the ADA Title II regulations explains that "[l]itigation expenses include items such as expert witness fees, travel expenses, etc." 28 C.F.R. Pt. 35, App. A, Section-by-Section Analysis, § 35.175. Courts have interpreted the statute and its implementing regulations to include reimbursement for experts fees. *See, e.g., Lovell v. Chandler,* 303 F.3d 1039, 1058 (9th Cir. 2002), *cert. denied,* 537 U.S. 1105 (2003).

93. In addition, the family may also be seeking reimbursement for expert witness fees and/or attorney fees through Section 504. In *L.T., et al v. Mansfield Township School District,* 2009 U.S. Dist. LEXIS 70133, the court noted: "Defendant does not address, however, whether reimbursement of expert costs is permissible for violations of the Rehabilitation Act. The Rehabilitation Act provides, "In any action or proceeding to enforce or charge a violation of a

provision of this subchapter, the court, in its discretion, may allow the prevailing party,

---

[1] In *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295 (2006), the court held that expert fees were not reimbursable under the IDEA. However, the Supreme Court rested its "resolution of the question presented in th[e] case ... by the fact that Congress enacted the IDEA pursuant to the Spending Clause." *Id.* In significant contrast, the ADA was not passed pursuant to the Spending Clause and is therefore not subject to the same limitations.

other than the United States, a reasonable attorney's fee as part of the costs." 29 U.S.C. § 794a(2).

94. Although this provision does not explicitly provide for the recovery of expert fees as part of the costs, the Rehabilitation Act incorporates the remedies available under the Civil Rights Act of 1964, which specifically provides for the taxation of expert fees. See 29 U.S.C. § 794a(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."); 42 U.S.C. § 2000e-5(k) ("[T]he court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs."). Thus, plaintiffs are entitled to reimbursement of their expert fees for their prevailing party status on their Rehabilitation Act claim. See *Neena S. ex rel. Robert S. v. School Dist. of Philadelphia,* 2009 WL 2245066, *11 (E.D. Pa. July 27, 2009) (finding that "[a]s plaintiffs were entitled to the same compensatory education under § 504 as they were awarded under the IDEA, they are prevailing parties under § 504 as well. Thus, plaintiffs are entitled to reimbursement for the evaluation under § 504 and the $ 2,475 evaluation will not be deducted from plaintiffs' requested costs."). Consequently, the Court modifies its Order of Judgment to reflect that the award of costs for plaintiffs' expert is with regard to their Rehabilitation Act claim only."

95. Remedies for Section 504, 29 U.S.C. §794, are provided for in 29 U.S.C. §794a(a)(2), which provides in relevant part: "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

96. Further, 42 U.S.C. § 2000e-5(k) provides: "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person. (Emphasis added)."

97. Once a Court holds that the public placement violated IDEA, "it is authorized to 'grant such relief as the court determines is appropriate.' 20 U.S.C. §1415(e)(2). Under this provision, 'equitable considerations are relevant in fashioning relief,' *Burlington School Committee v. Massachusetts Department of Education*, 471 U.S. 359 (1985), at 374, and the court enjoys 'broad discretion' in so doing. *Burlington, supra.*, at 369.

98. The Third Circuit has further held that under the IDEA, "the Courts are directed to 'grant such relief as [they] deem appropriate. 20 USC §1415(e)(3)...The ordinary meaning of these words confers broad discretion on the court. The type of relief is not further specified except that it must be 'appropriate.'" The Court went on to conclude that "'appropriate relief' under the IDEA includes retroactive tuition reimbursement'...to

30

parents as an available remedy in a proper case." *Susquenita School District v. Raelee S.*, 96 F.3d 78 (3d Circuit, 1996), quoting from *School Comm. Of the Town of Burlington v. Department of Education*, 471 U.S. 359, 369-70 (1985)

99. In fact, it is well settled that Administrative Law Judges and Hearing Officers have the authority to order educational services from specific providers. A well-known commentator in the field of special education law has stated: "Extensive authority establishes that a Hearing Officer has the power to order a child to be placed in a particular school or other educational setting, even when the placement has never been proposed by the school district." *Special Education Law and Litigation Treatise*, Professor Mark C. Weber, LRP Publications, p. 20:13 Section 20.13(2) citing *Diamond v. McKenzie*, 602 F. Supp. 632 (D.C. Cir. 1985); *Burger v. Murray County School District*, 612 F. Supp. 434 (N.D. Ga. 1984); *Cedar Rapids Community School District v. Garret F.* 526 F. U.S. 66 (1999) and *Burlington School Committee v. Department of Education,* 471 U.S. 359 (1985). (See also 58 Admin. L. Rev. 401, 407 (2006) noting that "most H/ROs ["hearing/reviewing officers"] have routinely considered the appropriateness of a parental proposal in which the H/ROs declare that the district's placement is inappropriate." Citing, in part, *Diatta v. District of Columbia*, 319 F. Supp. 2d 57 (D.D.C. 2004) in which the Court held "the hearing officer's denial of the education program requested by the parent constituted an abdication of her authority." Supra, p. 407, Fn. 38.)

100.    See also *Letter to Armstrong,* 28 IDELR 303 (OSEP 1997) which states that although IDEA does not specify what specific powers IHOs have to fashion remedies,

31

IHOs must have the authority to order any relief necessary to ensure a student receives a FAPE, and States must ensure that such orders are implemented and enforced.

## HEARING LOCATION AND DECISION REQUEST

101.   The family requests that the matter be set for hearing in a location that allows for the family to call off-site witnesses to testify either via speaker phone and/or via Skype. If Skype is to be used, counsel for Petitioner will provide the necessary laptop at the hearing site as well as a web cam to the person testifying. This will enable the person who is testifying to be viewed live by the parties on a laptop screen during that person's testimony. The family requests that the hearing be conducted in a room large enough accommodate the IHO, parties, counsel, witnesses, exhibit binders and court reporter comfortably and prefers a large conference room or auditorium to a classroom.

102.   The family is requesting an electronic copy of the hearing officer's decision and also an electronic copy of the hearing transcript.

103.   The family requests, at this time, that the hearing be closed to the public, but may change this request at a later date pursuant to 34 C.F.R. § 300.512, which states in relevant part "Parents involved in hearings must be given the right to …(2) open the hearing to the public…" This right has been further explained in *Letter to Schad* (December 2004) from the Family Policy Compliance Office, which is charged with implementing and interpreting Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g.

Respectfully submitted,

32

*Catherine M. Michael*

Catherine M. Michael 22474-49
HOLLINGSWORTH & ZIVITZ
11555 N Meridian, Suite 530
Carmel IN 46032
317/569-2200
317/569-2202 fax
cmichael@hzlegal.com