HR-033-2019                                                                03-30-2019

## ADMINISTRATIVE DUE PROCESS PROCEEDING
## BEFORE AN INDEPENDENT HEARING OFFICER
## APPOINTED BY THE INDIANA DEPARTMENT OF EDUCATION
## PURSUANT TO 511 IAC 7-45-3
## DUE PROCESS HEARING DECISION

**Petitioner:**                      

**Parents' Names:**                  

**Petitioner's Representatives:**    Catherine Michael
                                     Hollingsworth & Zivitz
                                     11555 North Meridian Street, Suite 530
                                     Carmel, Indiana 46032

                                     Thomas Blessing
                                     Massillamany, Jeter, & Carson
                                     11650 Lantern Road, Suite 204
                                     Fishers, Indiana 46038

                                     Sonja Kerr
                                     Hollingsworth & Zivitz
                                     11555 North Meridian Street, Suite 530
                                     Carmel, Indiana 46032

**Respondents:**                     MSD Warren County
                                     Ralph Shrader, Superintendent
                                     101 North Monroe Street
                                     Williamsport, Indiana. 47993

                                     Wabash River Special Services Cooperative
                                     Jill Coffing, Director
                                     423 4th Street
                                     Covington, Indiana 47932

**Respondent's Representatives:**    Monica Conrad
                                     Lewis Kappes
                                     8585 Broadway, Suite 610A
                                     Merrillville, Indiana 46410



Exhibit
C

HR-033-2019                                                                    03-30-2019

Stephanie Slone
Lewis Kappes
One American Square, Suite 2500
Indianapolis, Indiana 46282

**Hearing Number:** HR-033-2019

**Hearing Dates:** February 4, 5, 6, 8, 26, 27, 28, & March 1, 2019

**Decision Date:** March 30, 2019

**Independent Hearing Officer:** M. Nichols Dilk, Ph.D., J.D.

_____                    _____
**M. Nichols Dilk, Ph.D, J.D.**                              **Date**

**ADMINISTRATIVE DUE PROCESS PROCEEDING
BEFORE AN INDEPENDENT HEARING OFFICER
APPOINTED BY THE INDIANA DEPARTMENT OF EDUCATION
PURSUANT TO 511 IAC 7-45-3 & 7
M. NICHOLS DILK, PH.D., J.D.**

**DUE PROCESS HEARING DECISION
HEARING NUMBER HR-033-2019**

The purpose of this hearing was to receive evidence and testimony in preparation for

rendering a decision regarding issues delineated by the Petitioner (hereinafter "Student") and the

Respondent (hereinafter "School") pursuant to provisions of 511 IAC 7-45-3 & 7.

## PROCEDURAL HISTORY

On November 27, 2018, the Indiana Department of Education Office of Special

Education received from the Student a request for a due process hearing that included appearance

of counsel.  In the 33-page hearing request, the Student made numerous factual allegations

resulting in the School denying the Student a free appropriate public education, summarized as

follows:

1. The IEPs the School devised did not provide the Student a free appropriate education
   in the least restrictive environment that addressed the Student's significant academic,
   behavioral, social, or medical needs and included appropriate measurable goals;

2. The School did not offer or provide appropriate related services for the Student,
   particularly in the areas of occupational therapy, assistive technology, or parental
   support;

3. The School did not inform or advise the Student's parents about the continuum of
   available services;

4. The School did not provide accurate and true progress reports as often as other
   students received grade reports;

3

VII.    Whether Respondent properly monitored and provided the Student's parent reports of the Student's progress toward goals in compliance with IAC 511 7-42-6(f)(3) and 511 IAC 7-42-8(b).

VIII.    Whether Respondent properly provided the Student's parent the opportunity to meaningfully participate in the Student's Case Conference Committees in compliance with IAC 511 7-42-6(b)(2).

IX.    Whether Respondent properly conducted an educational evaluation of the Student sufficiently comprehensive to identify all of the Student's special education and related service needs consistent with 511 IAC 7-40-3(e & f).

Either party may enter an objection to or request rephrasing any of the Issues as stated above. Objections or requests to rephrase must include by supporting citations to IAC 511-7. Any such objections or requests must be submitted by January 05, 2018.

So Ordered, this 12th day of December, 2018.

/ss/ Dr. M. Nichols Dilk, Ph.D, HSPP, JD
M. Nichols Dilk, Ph.D., J.D.
Independent Hearing Officer

Distribution on following page:

Hearing Number:  HR-033-2019                                            12-12-2018

Distribution via ICHAMP:

Catherine Michael, Petitioner's Attorney
Tom Blessing, Petitioner's Attorney

Monica Conrad, Respondent's Attorney
Stephanie Sloan, Respondent's Attorney

IDOE Office of Special Education
Attn:  Kim Payton

5. The School did not develop comprehensive, appropriate, and timely Functional Behavior Assessments;

6. The School did not develop and implement appropriate and timely Behavior Intervention Plans;

7. The School did not have staff appropriately trained to meet the Student's educational and behavioral needs;

8. The School placed the Student on shortened school days that did not provide academic or non-academic education in the least restrictive environment;

9. The School did not properly monitor the Student's progress toward goals in his IEPs;

10. The School did not evaluate or reevaluate the Student comprehensively enough to determine his specific educational needs;

11. The School did not allow the Student's parents to have meaningful participation in development of the Student's IEP;

12. The School did not provide the Student's parents prior written notice when changing the Student's placements;

13. The School informed the Student's parents the School would not allow the Student to return to school unless they paid for property damage the Student caused during behavioral outbursts thereby contradicting his right to a free appropriate public education.

On November 28, 2018, the Indiana Department of Education appointed the Independent Hearing Officer (hereinafter "IHO"), who assumed jurisdiction over all matters as provided in 511 IAC 7-45-3(d); 511 IAC 7-45-7, CFR 300.506-300.503, and IC 4.21.5-3 *et seq.* The School submitted appearance of counsel that same day.

4

On December 3, 2018, the IHO issued a Preliminary Scheduling Order that provided important timeline dates and set a date for a Prehearing Conference. The IHO also issued a Notice of Prehearing Conference. On December 5, 2018, the School submitted a request to change the date of the Prehearing conference because one of the attorneys had a prior obligation on the day scheduled. Because the School had two attorneys representing them the IHO denied the request to reschedule. On December 6, 2018, the School's co-counsel submitted an additional request to reschedule because she, too, had a prior obligation. Because both attorneys had prior obligations, on December 10, 2018 the IHO granted the School's request to reschedule.

On December 7, 2018, the School submitted their Response to the due process hearing request. The School offered additional information pertaining to factual allegations the Student made in the due process hearing request and denied all issues identified by the Student in that request. Also, on December 7, 2018, the Student submitted appearance of co-counsel.

On December 12, 2018, the IHO issued a Statement of Issues. On that same day, the IHO convened a Prehearing conference via telephone conference call. The IHO reviewed some basic information about the Student to ensure accuracy. The parties stated they held a Resolution session on December 12, 2018 that the attorneys did not attend. The School asserted they had provided the Student his educational record and were compiling another copy of the record with additional documents not usually part of the educational record. The Student anticipated needing three to four days for the hearing. The parties requested a 30-day extension of time which the IHO granted pending receipt of a written request. The extension rendered March 11, 2019 as the revised Decision date. With agreement of the parties, the IHO set the due process hearing for February 4, 5, 6, & 8, 2019. The IHO issued a Notice of Hearing Dates and Associated Orders on December 12, 2018.

5

On December 13, 2018, the School submitted a lengthy Motion for Sufficient and More

Definite Statement. On December 18, 2018, the IHO issued a ruling on the School's claim of

insufficiency. The IHO found the Student's due process hearing request clearly met sufficiency

requirements pursuant to 511 IAC 7-45-3(b) and denied the School's request for a sufficient and

more definite statement.

Because of the lengthy and complex nature of submissions by both parties, the IHO

ordered another Prehearing conference to be held in person at MSD Warren County and ordered

a verbatim transcript of the conference. After numerous contacts with the parties to find a

mutually agreeable date, the IHO issued a Notice of Prehearing Conference at MSD Warren

County on December 19, 2018. The IHO set the prehearing conference for January 7, 2019 and

issued Orders Regarding Prehearing Conference at MSD Warren County on January 2, 2019.

Between December 19, 2018 and January 6, 2019 both parties submitted numerous

filings, discovery requests, objections to discovery requests, and objections to the Statement of

Issues even though the IHO clearly stated such matters would be addressed at the prehearing

conference. On January 6, 2019, the IHO issued and order again reminding the parties of such.

The Prehearing conference convened on January 7, 2019. The IHO reviewed and ruled

upon each party's objections to the Statement of Issues. The parties spent a considerable amount

of time debating the School's assertion that a mediation agreement (that the IHO had not seen)

the parties entered into in the Spring of 2018 addressed several of the issues the Student raised in

the due process hearing request. The IHO ruled that the Student could not present testimony or

evidence at hearing about the issue expressly stated in the two-page mediation agreement.

The IHO issued several Subpoenas submitted by the School with no objection from the

Student. The School submitted Response in Opposition the Petitioners' Request for Production

6

of Documents and Respondents' Request for Protective Order. The School raised an objection to
the Student's discovery request for emails regarding the Student, asserting that production of the
emails put an undue burden on the School. The school also asserted the Student did not follow
proper procedures for making discovery requests and that all discovery requests had to be
reviewed and approved by the IHO. The School further claimed the emails were not a part of the
Student's educational record. The IHO overruled the School's blanket objection to all discovery
of emails but ordered the Student to submit a revised discovery request that had a more limited
and narrow scope. The parties spent considerable additional time debating discovery requests
and procedures for the requests.

The parties discussed witness lists and order of witnesses. The IHO informed the parties
that they would need to proffer each exhibit separately. The IHO confirmed the hearing would
be closed to the public and had Ordered a separation of witnesses.

On January 8, 2019, the Student submitted a revised request for production that included
a revised request for emails regarding the Student. On January 9, 2019, the School submitted a
request for production of documents and a set of interrogatories to the Student. On January 10,
2019, the School submitted additional Subpoena requests and HIPPA release forms. On January
14, 2019, the Student submitted a response to the School's previously filed objections to the
Student's request for production of documents.[1] On that same day, the Student submitted a
Motion to Compel discovery, requesting an order for the School to produce discovery documents
the Student requested from the School on December 11, 2018.

On January 15, 2019, the School submitted two additional Subpoena requests. That same

---

[1] The Student referred to the School's Response in Opposition to Petitioner's Request for Production of Documents
and Respondents' Request for Protective Order submitted and discussed during the January 7, 2019 Prehearing
conference and resubmitted through the ICHAMP electronic portal on January 9, 2019 and January 11, 2019.

day, the School submitted a copy of the Mediation Agreement signed by the School and the

Student dated May 15, 2018. On January 15, the IHO issued Orders Regarding Petitioners'

Request for Production of Documents that provided specific parameters and limitations on the

Student's discovery requests previously submitted to the School. That same day, the School

submitted a motion requesting clarification of the IHO's Orders issued earlier that day.

On January 16, 2019, the Student submitted appearance of additional co-counsel. Also,

on January 16, 2019, the School submitted an additional Subpoena request. The Student

submitted two Motions to Quash two of the School's Subpoenas because they pertained to non-

parties and because they did not comply with Trial Rule 34(C) regarding required language and

timelines for response respond requirements. That same day, the School submitted a response to

the Student's Motions to Quash asserting that timelines for discovery response in civil cases do

not necessarily apply to Article 7 due process hearings because of the abbreviated timelines in

Article 7 proceedings.

On January 17, 2019, the Student submitted suggestions for orders on the School's

motion for clarification submitted on January 15, 2019. On January 17, 2019, the IHO issued a

denial of the Student's suggestion because their suggestion would result in retrieval of emails

regarding other students having nothing to do with this Student and result in unnecessary review

of completely unrelated emails. Also, on January 17, 2019, the IHO issued Orders providing

clarification of Orders issued on January 15, 2019 regarding the School's request for production

of documents.

On January 18, 2019, the IHO issued Orders denying the Student's Motions to Quash the

two Subpoenas the School requested on January 16, 2019 finding the School's Subpoenas

reasonable. That same day, the IHO issued Orders regarding the School's discovery request for

8

interrogatories submitted on January 9, 2019. The IHO denied most of the School's

interrogatories. Given the Exchange Date in this matter was set for January 28, 2019, the IHO

ordered the parties to refrain from submitting any additional discovery requests.

On January 22, 2018, the School submitted two more Subpoena requests, asserting they

had only just found the addresses of the persons subject to the Subpoenas. On January 23, 2019,

the Student submitted a Motion requesting the IHO reconsider Orders regarding the Student's

requests for production of documents; specifically Orders that set parameters and limitations on

the Student's requests for emails regarding the Student. Also, on January 23, 2019, the Student

submitted 32 requests for Subpoenas for witnesses the Student might call to testify at the hearing.

On January 25, 2019, the School submitted an objection to the Student's request for

further discovery, essentially asserting that the Student's request to reconsider Orders that set

parameters and limitations on requests for emails regarding the Student constituted an additional

demand. The School submitted a letter to the Student that delineated the total documents

reviewed and the total documents produced to the Student in response to the Student's discovery

requests. On January 25, 2019, the School objected to 21 of the 32 Subpoenas the Student

requested on January 23, 2019. That same day, the IHO contacted the parties by telephone to

arrange an impromptu Prehearing Conference to address the most recent motions and objections.

The IHO conducted a conference call with the parties and discussed the parties' objections to

Subpoenas and matters regarding potential witnesses. Regarding the 21 Subpoenas to which the

School objected, the School asserted, in part, they were overly broad because they did not

specify the time witnesses needed to appear, most of them would compel persons not employed

by the School. In addition, the School claimed that because of the late date of the request, the

School would not have sufficient time to secure records necessary for them to prepare for cross.

The IHO allowed the Student's requested Subpoenas provided the Student resubmit the

Subpoena requests to include the time of appearance as well as the date.

On January 28, 2019 (the Exchange Date), the Student submitted the revised Subpoenas,

the Student's witness list, the Student's expert witness disclosure statement, and the Student's

exhibit list. The School submitted the School's witness list and the School's exhibit list. The

Student also submitted a Memorandum on Making Student's Attendance Conditioned on

Payment for Property Damages as Denial of FAPE. The School submitted a letter to the Student

informing them the School had inadvertently included in discovery documents protected as trial

preparation material and asked the Student to destroy several documents identified by bates

numbers.

On January 30, 2019, the IHO issued Orders Regarding Additional Discovery Requests.

The IHO denied the Student's January 23, 2019 additional discovery request and motion to

reconsider previous Orders. The IHO also denied the School's January 25, 2019 additional

discovery requests.

On January 30, 2019, the School submitted a Motion in Limine in response to the

Memorandum on Making Student's Attendance Conditioned on Payment for Property Damages

as Denial of FAPE the Student submitted on January 28, 2019. The School requested preclusion

of any mention of a pending matter in small claims court involving property damage resulting

from the Student's behavioral outbursts and claimed the Student attempted to raise a new issue.

The School asked the IHO to Order the parties stipulate that the Student had not missed any

school as a result of the lawsuit and stipulate that the School will not deny the Student the right

to attend school due to failure to pay property damages. On January 31, 2019, the IHO issued a

ruling on the School's Motion in Limine. In that ruling, the IHO made a distinction of the

purpose of the civil court case versus that of the due process hearing. The IHO determined the

parties could enter evidence regarding circumstances surrounding alleged damage to the extent

the evidence had relevance as to whether the School provided the Student a free appropriate

public education, but that the actual monetary cost of the alleged damage would lack relevance.

The IHO pointed out to the parties that the IHO had not added any issues to those in the

Statement of Issues issued on December 12, 2018. Any new issues would need to be raised

through a separate due process hearing request.

      On January 31, 2019, the Student provided a prospective witness order and a bench brief

on Free Appropriate Public Education. Also, on January 31, 2019, the School submitted a

Motion in Limine requesting the IHO preclude issues resolved in the May 14, 2018 Mediation

Agreement from being addressed in the due process hearing. On that same day, the IHO ruled

that evidence regarding the issues identified as resolved in the two-page mediated agreement

dated March 2018 until the end of the standard academic year of May 2018 could not be

admitted.

      On January 31, 2019, the IHO issued Orders regarding the Student's bench brief on a free

appropriate public education. The IHO listed the Issues as laid out in the December 12, 2018

Statement of Issues. The IHO Ordered the Student to address the Issues as stated and address

circumstances regarding property damage in a manner consistent with the IHOs January 31, 2019

Orders regarding the School's Motion in Limine on the matter.

      On February 1, 2019, the Student submitted a response objecting to the School's Motion

in Limine regarding the March 2018 Mediation Agreement. The Student disagreed with the

School about what issues the Mediation Agreement resolved. On February 1, 2019, the School

submitted a response to the Student's expert witness disclosure statement submitted on January

11

28, 2019. The School re-asserted that the late disclosure did not allow time for the School to

conduct discovery necessary for them to prepare for cross. The School further objected to one of

the expert witnesses testifying without having provided a written report and claimed

identification of that witness at the late date violated the 5-day rule. The School requested a

prehearing order to clarify designation or disclosure of experts and the extent to which the IHO

would apply Trial Rules for civil court proceedings. On February 1, 2019, the IHO issued

Orders regarding the School's objections to the Student's designation of expert witnesses. The

IHO ruled would hear testimony from the witnesses and determine the weight to give the

testimony as appropriate. The IHO Ordered the parties the parties to enter objections at the time

the witness testifies at the due process hearing.

       The due process hearing convened as scheduled on February 2, 2019. At the outset of the

Hearing the IHO held a prehearing conference on the Record to address questions, exhibits,

objections, and procedural matters.

       The hearing was closed to the public and IHO ordered separation of witnesses. All

witnesses took an affirmation of the truthfulness of their testimony. The Student requested an

electronic copy of the transcript and an electronic copy of the Decision.

       During the Prehearing conference, the Student objected to having two school employees

present given the hearing was closed to the public. The School stated that the school employees

represented the two school entities named in the due process hearing. The IHO agreed each

entity could have a representative at the due process hearing.

       The School then raised the matter of the mediation agreement. The School asserted the

agreement settled not only the issues stated on the actual signed agreement but included several

other issues described in a narrative on the mediation request form. The Student contended the

mediation agreement resolved only the issues stated in the actual signed agreement. Lengthy

discussion ensued. Ultimately, the IHO had already ruled on this matter in the ruling on the

School's Motion in Limine. The mediation agreement listed only two issues. The agreement did

not have the two narrative pages attached and it did not list other issues from the narrative in the

mediation request. The IHO maintained her original ruling and overruled the School's objection.

     The IHO disclosed having known one of the Student's witnesses professionally and

personally for many years. The IHO asserted that would not have any bearing on weight given

to that witness' testimony or cause any bias. Neither party objected. Neither party raised

objections to witnesses on witness lists. The IHO ensured the parties had no further objections

that needed to be addressed before convening the Hearing.

     The hearing progressed very slowly due to very lengthy witness testimony[2], numerous

objections to exhibits and questions asked of witnesses, and the extraordinary amount of time

each party spent searching through the thousands of pages of documents each had brought with

them in order to locate the particular exhibit they wanted to enter into evidence. By the third

day, it became clear that the hearing would require additional time. The parties requested an

additional four days and agreed to request a 30-day extension of time to accommodate the

additional hearing dates. Upon agreement of the parties, the IHO set the additional dates for

February 26, 27, 28, and March 1 2019. The IHO informed the parties no additional dates would

be scheduled after March 1, 2019.

     On the third day of the hearing, the Superintendent asked the IHO if he could ask a

procedural question. The School's attorneys were running late, but the IHO agreed to let him ask

---

[2] By the end of the second day, the parties had completed questioning of only two witnesses and completed direct
examination of a third witness. The IHO did not know until the fourth day she had the authority to limit the time the
parties had to question witnesses.

13

a procedural question ex parte. The IHO and the Student's counsel went to a different room. To preserve confidentiality, the IHO asked to close the office door. The Superintendent asked if the School would be allowed to settle this matter even though the hearing had started. The IHO informed the Superintendent that he could enter into a settlement agreement at any time, that the attorneys would negotiate the agreement, and file a written motion to dismiss. At that point, the School's counsel arrived and expressed extreme objection to the ex parte discussion. The IHO detailed what the Superintendent asked and the answer the IHO provided.

Before reconvening, the IHO had a sidebar with the attorneys to discuss the IHOs concerns about remote witness testimony via the telephone because, unlike in person testimony, the parties had no way of knowing what documents or notes to which the witness might be referring and whether they were using documents not entered into evidence. The IHO asked if the Student's counsel could look into arranging testimony by video conference. The Student's counsel agreed to see if that was viable. If not, the party calling the remote witness would need to instruct the witness to refer only to documents counsel provided identified by the document bates number.

On February 8, 2019, the Student submitted a Motion to extend the decision deadline for 30 days rendering March 31, 2019 the revised Decision date. The IHO granted the Motion. The hearing recessed at the end of the day on February 6, 2019.

On February 14, 2019, the Student submitted a Motion to take Judicial Notice of a Motion to Dismiss filed with the Warren County Circuit Court Small Claim Division. The IHO denied the Motion on February 14, 2019. On February 21, 2019, the School filed a Motion to Clarify the Parties' Responsibilities for the Exchange of Revised Witness List, Order of Calling, and Expected Duration of Testimony. On that same day, the Student submitted a Response to

the School's Motion to clarify. The IHO did not issue a ruling on the Motion. On February 22,

the Student submitted Subpoena requests for the appearance of two witnesses, which the IHO

issued.

The hearing reconvened as scheduled on February 26, 2019. At the conclusion of

testimony on March 1, 2019, the parties requested to submit a closing brief instead of giving oral

closing statements. The IHO agreed and set a date by which the parties must submit the briefs.

The IHO informed the parties of their rights to obtain a verbatim copy of the transcript,

procedures for appeal, and the date by which the Decision would be issued.

On March 7, 2019, the School submitted a Motion to extend the closing argument brief

deadline due to a family emergency affecting the primary author. The IHO granted the Motion

and extended the deadline to March 22, 2019. Both parties submitted their closing briefs on that

date.

## ISSUES PRESENTED

I.     Whether Respondent devised appropriate IEPs for the Student consistent with
       provisions of 511 IAC 7-42-6 reasonably calculated to provide a meaningful
       educational benefit.

II.    Whether Respondent ensured the availability of a continuum of placement options
       in the least restrictive environment consistent with 511 IAC 7-42-10(b)(4).

III.   Whether Respondent appropriately determined the least restrictive environment
       for the Student consistent with 511 IAC 7-42-10(a).

IV.    Whether Respondent appropriately provided special education and related
       services to the Student consistent with and pursuant to 511 IAC 7-42-10(b).

V.     Whether Respondent appropriately conducted a Functional Behavioral
       Assessment consistent with 511 IAC 7-32-41.

VI.    Whether Respondent appropriately devised and implemented a Behavioral
       Intervention Plan consistent with 511 IAC 7-32-10.

VII.    Whether Respondent properly monitored and provided the Student's parent
        reports of the Student's progress toward goals in compliance with IAC 511 7-42-
        6(f)(3) and 511 IAC 7-42-8(b).

VIII.   Whether Respondent properly provided the Student's parent the opportunity to
        meaningfully participate in the Student's Case Conference Committees in
        compliance with IAC 511 7-42-6(b)(2).

IX.     Whether Respondent properly conducted an educational evaluation of the Student
        sufficiently comprehensive to identify all of the Student's special education and
        related service needs consistent with 511 IAC 7-40-3(e & f).

## FINDINGS OF FACT

1.  The Indiana Department of Education properly assigned the Request for Due Process

Hearing to this IHO pursuant to IC 4-21.5 *et seq.* and 511 IAC 7-45-3, establishing the authority

of the IHO to hear and rule upon all matters presented.

2.  All Findings of Fact that can be deemed Conclusions of Law are hereby deemed

Conclusions of Law. All Conclusions of Law that can be deemed Findings of Fact are hereby

deemed Findings of Fact.

3.  All due process procedures complied with requirements of 511 IAC 7-45-3 through 7-

45-11 and IC 4-21.5 *et seq*.

4.  At the time of the Due Process Hearing, the Student was eight years old and attended the

third grade at Williamsport Elementary School in MSD Warren County, Williamsport, Indiana.

5.  The Student had a long history of significant behavioral issues that began before the age

of three. Over the years, health care providers attempted numerous medications to help manage

the Student's behavioral issues including, but not limited to, risperidone, guanfacine, loratadine,

ariprazole, fluoxetine, olanzapine, topiramate, dextroamphetamine, clonidine, and sertraline.

The Student had highly variable response to medication regimen that frequently changed due to

significant adverse side effects and decreased efficacy over time. The adverse effects included,

but were not limited to, extreme lethargy, mania, anxiety, vocal tics, weight gain, agitation, and sensory sensitivity.

6.   Since at least age three, the Student had frequent severe behavioral outbursts such as hitting, kicking, throwing objects, breaking objects, yelling, and throwing over tables, desks, and chairs. The behavioral outbursts occurred at home, at school, and in public.

7.   The Student's parents have gone to great lengths to obtain assistance for their son. They sought help from psychiatrists, psychologists, a neurologist, therapists, private occupational therapist, and a behavior specialist. The took him for private psychological and psychoeducational evaluations and they took him for a week-long inpatient evaluation at a mental health treatment center.

8.   The Student has been diagnosed at various times with mood disorder, Bipolar 1 disorder, oppositional defiant disorder, and attention deficit hyperactivity disorder.

9.   The Student attended a private preschool where a close friend of his mother worked. He showed difficulty learning early academic tasks and had difficulty following directions. He displayed behavioral problems while in preschool, but his mother's friend worked closely with him to address the problems.

10. The Student entered kindergarten at Williamsport Elementary in fall of 2015. At the time he entered kindergarten, the Student had been diagnosed with a mood disorder and ADHD.

11. At the request of the Student's parents, the School conducted a psychoeducational evaluation in September of 2015. That evaluation included assessment of the Student's cognitive functioning, academic skills, social, emotional, and behavioral functioning, and adaptive functioning. The evaluation showed the Student's cognitive functioning fell within the low average range. His vocabulary and number skills fell within the average range, but his

17

expressive, receptive, and letter/word skills fell in the below average range. Assessment of

social, emotional, and behavioral functioning indicated significant problems with hyperactivity,

aggression, inattention and adaptive skills both at home and at school. Ratings of adaptive

functioning at school fell in the extremely low range, and low range at home.

12. A Case Conference Committee convened on October 12, 2015. The Case Conference

Committee made a note about the Student's medication. The Case Conference Committee had

concerns about the Student throwing and punching things when upset, tattling, and running in the

hallways. The Case Conference Committee found the Student eligible for special education

services under Other Health Impairment. The Student's IEP included goals for print concepts,

sight word recognition, social skills, and physical contact. The social skills goal focused on the

Student using a self-calming strategy measured by descriptive documentation. Present level

reported in the physical contact goal disruptive behaviors including pushing over chairs,

wrestling with peers, kicking at or toward objects and others, and hitting peers. The Present

level referenced increased frequency and ferocity when on versus when off medication. The

behavior goal stated he would "refrain from making unnecessary or unwanted contact with his

other peers" as measured by descriptive documentation. At the time of the Case Conference

Committee meeting, a Functional Behavioral Assessment was in progress but had not been

completed. The Student was placed in a general education setting with small group reading and

literacy skills instruction and social skills training 30 minutes twice daily.

13. The School completed a Functional Behavior Assessment (FBA) on December 2, 2015.

The report twice referenced medication as a mitigating factor for his behavior. The FBA

included a teacher interview, Problem Behavior Questionnaire, five detailed classroom

observations lasting 30 to 60 minutes with antecedent-behavior-consequences charts, and a

Reinforcers for Elementary Students checklist. The FBA focused on tattling, running in the
hallway, and physical aggression. The report identified the frequency of behaviors, when the
behaviors were most and least likely to occur, and antecedents and consequences of the
behaviors. The FBA only targeted tattling as a behavior for intervention and recommended
using a visual schedule and positive behavioral supports as interventions.

14. No evidence showed the School developed a structured, cohesive, well-defined behavior
intervention plan after the FBA was completed.

15. The Case Conference Committee reconvened after the Student entered the first grade on
October 11, 2016. Most of the IEP remained identical to the October 12, 2015 IEP. Specifically,
except for changing the date of the benchmark from November 2016 to November 2017 for the
physical contact goal, the social skills and physical contact goals were exactly the same as the
year before, including present levels. There was no indication of any progress the Student had
made. His goals for sight word recognition and decoding had been updated and included
indications about progress he had made toward meeting his goals in those areas. The IEP
included a reference to medication change following an inpatient stay at a mental health facility
the previous summer. The IEP called for the Student to remain in the general education setting
except for computer based reading remediation in the special education setting 25 minutes daily.

16. Despite having completed an FBA in December of 2015, the IEP contained the same
strategies to address his behavior issues (allowing a break when agitated, preferential seating,
and point system) as the previous year when the Case Conference Committee did not have the
information from the FBA. The school did not devise a behavior intervention plan linked to the
FBA.

17. Shortly after entering the second grade, the School conducted an Occupational Therapy

evaluation on September 1, 2017. Assessment procedures included the Sensory Processing
Measure (SPM) completed by the Student's teacher and his mother and three classroom
observations by the Occupational Therapist. During one of the classroom observations, the
Student had a significant behavioral incident that involved throwing objects and punching a
teacher. School personnel held the Student in physical restraints for approximately 15 minutes.
Based on the results from the SPM ratings, the Occupational Therapist concluded the Student
had some problems across all the sensory areas rated. Her classroom observations lead her to
conclude the Student may be seeking proprioceptive input; however, she did not perform any
formal assessment to confirm her hypothesis. By the Occupational Therapist's own testimony,
the OT did not conduct a comprehensive OT evaluation.

18. The Case Conference Committee reconvened for the Student's annual case review on
October 18, 2017 after the Student entered the second grade. Since entering the second grade,
the Student had displayed numerous significant violent, aggressive behavioral outbursts
including throwing objects, biting, kicking, punching, and spitting at adults. His outbursts lasted
10 to 40 minutes and at times necessitated school personnel to physically restrain him to prevent
harm to the Student or others. Between August 10, 2017 and the date of the Case Conference
Committee meeting, the Student had 18 behavioral outbursts involving physical aggression or
damaging property. The Case Conference Committee referenced changes in the Student'
medications and associated that with improved behavior.

The Case Conference Committee devised a different set of strategies to address the Student's
behavior as follows:

8:25 – 8:30 Check in, discuss daily goals, social story, prompted on snack

12:30 – 12:40 Ten Minute activity break in gym (throwing/kicking ball, exercise routine, or
rest), prompted snack.

2:00 – 2:05 Check out, discuss behavior chart points, social story focus, rewarded for meeting point goal

- Sensory Breaks: [Student] has a quiet place to relax (been bag, OT sensory manipulatives), he is allowed to go to the gym for heavy input time, his (*sic*) offered a snack at that time.

- Reward System: (points) [Student] has 3 goals that he works on daily – keep hands and feet to self, no meltdowns, used restroom with friends. He is rewarded for achieving these goals with a prize of his choice.

- [Student] is also give (*sic*) 3 Safe Passes. He can utilize these when he is feeling anxious or upset about something. These allow him to go to his safe spot in the room. This spot has a bean bag chair, sensory type fidgets, and different weighted objects.

- When [Student's] behavior in the classroom is too much to ignore (such as throwing classroom materials, etc), he will be escorted from the room. He is always given the option to leave on his own.

The Case Conference Committee added 30 minutes of Occupational Therapy consultation per reporting period. The OT provide a number of specific strategies to use with the Student such as use of a visual timer, countdown transitions, sensory breaks where he could use fidget spinners, throw a ball against a wall, used weighted blankets or lap pads, and breathing exercises.

The behavioral goals in the IEP included return to task as measured by behavior chart and teacher observations. Though the Goal Statement indicated that the Student would use coping strategies and remain on task for at least five minutes with an average of 50% across all classroom environments, present levels for that goal did not include objective information showing how often the Student demonstrated the use of coping strategies at the time the goal was written; hence there was no defined start point from which to measure progress. The other behavioral goal targeted self-regulation of aggression as measured by behavior chart and teacher observation. As with the return to task goal, the present level provided no objective information about the frequency of his use of self-regulation strategies at the time the goal was written. As

21

such, the goal had no objective basis by which to measure the student's progress toward the goal
of using safe passes and self-regulation strategies on three out of five opportunities.

The IEP also contained a goal for Sight Words. In contrast to the two behavior goals, the
sight word goal contained clear, objective data about the Student's present levels and a data-
based means of measuring his progress toward achieving the goal. The Student remained in a
full-time general education placement with 25 minutes per day of computer-based remediation in
the special education setting. The Case Conference committee considered placing the Student on
half-days, but opted to wait until the FBA was completed.

19. At the October 18, 2017 Case Conference Committee meeting, the parents consented for
the School to conduct an updated FBA. Evidence the School submitted of the purported FBA
conducted in October 2017 included a parent interview form and two behavior functions
checklists completed by two teachers. It contained no interpretation or compilation of the parent
interview or the behavior checklists. In contrast, the FBA conducted in December 2015 included
a teacher interview, Problem Behavior Questionnaire, five detailed classroom observations
lasting 30 to 60 minutes with antecedent-behavior-consequences charts, and a Reinforcers for
Elementary Students checklist. A school psychologist integrated and interpreted the results and
produced a written FBA report. No evidence showed involvement of the school psychologist in
the October 2017 process, no indication that anyone analyzed or integrated the parent interview
form and behavior functions checklists, no indication if anyone interpreted the findings, and no
written FBA report that documented antecedents and consequences of target behaviors.

20. The School reconvened the Case Conference Committee on December 11, 2017. The
stated purpose of the Case Conference Committee meeting was to revise the Student's IEP.
Since the October 15, 2017 Case Conference Committee meeting, the Student had 13 behavioral

outbursts involving physical aggression; three of which also involved property damage. Many of

the Student's outbursts since the beginning of the school year resulted in removal from the

classroom and physical restraints. A school psychologist did not attend the Case Conference

Committee meeting. The IEP provided for 30 minutes to work on specific social skills with a

teacher, but did not indicate how many times per week.

The Student had shown significant lethargy at school and the Case Conference Committee

associated his outbursts with lack of sleep. The Case Conference Committee decided to shorten

the Student's school day by two hours to allow the Student extra sleep before going to school.

The IEP showed no indication that the Case Conference Committee discussed any other

placement options other than shortening the Student's school day. Other than the change to a

shortened placement and addition of 30 minutes of social skills training, the Case Conference

Committee made no changes to the Student's IEP. The IEP contained no mention of the FBA

conducted in October of 2017 and made no changes to the behavior plan stated in the October

18, 2017 IEP.

21. The Student had a private psychological evaluation on May 26, 2017. The evaluation

included the Wechsler Intelligence Scale for Children – V, Adaptive Behavior Assessment Scale

– 3 (parent and teacher forms), the Autism Spectrum Rating Scales (parent and teacher forms).

At that time, the Student's overall cognitive abilities fell at the 79th percentile, placing him in the

high average range. His verbal comprehension fell at the 77th percentile; visual-spatial

functioning fell at the 87th percentile; fluid reasoning fell at the 79th percentile; working memory

fell at the 75th percentile; and processing speed fell at the 63rd percentile. The psychologist

concluded results and presentation were not consistent with Autism Spectrum Disorder. He

concluded underdeveloped impulse control, emotional and social deficits, and lack of mastery of

mastery in significant developmental tasks contributed to the Student's behavioral difficulties.

22. The School conducted a psychoeducational re-evaluation during December 2017 and
January 2018. Assessment of the Student's academic achievement showed the Student's letter
and word recognition, reading fluency, math fluency, and written expression fell at the 8th
percentile or below. Behavior ratings by his teacher showed clinically significant problems in
the areas of hyperactivity, aggression, atypical behavior, withdrawal, and adaptability.
Additional behavior ratings by the Student's teacher showed clinically significant problems with
inattention, hyperactivity and impulsivity, and defiance and aggression. The school psychologist
concluded the Student met eligibility criteria of Emotional Disability.

23. The Case Conference Committee reconvened on January 17, 2018. Since the Case
Conference Committee met on December 11, 2017, the Student had five significant behavioral
outbursts. The School was on holiday vacation for approximately eight school days during that
time period. In addition, the Student missed several other days during that time because of illness
and school cancellations. The IEP referenced medication change and associated the medication
change with no removals during the two weeks after returning from holiday break. The Case
Conference Committee made Emotional Disability his primary area of eligibility and Other
Health Impaired his secondary area of disability. The IEP shows the behavioral goals of return
to task and self-regulation of aggression remained identical to those in the October 18, 2017 IEP.
In addition, the Case Conference Committee made no changes to the behavior plan, despite the
continued aggressive and destructive behavioral outbursts. The Student remained on the
shortened day in the general education setting with a daily ten-minute check-in and check-out
period in the special education setting and a daily ten-minute break for stress relief and anger
management in the special education setting.

24

24. After the January 17, 2018 Case Conference Committee meeting, the Student had four
additional significant behavioral incidents of physical aggression and property damage between
January 17 and May 5, 2018. Three of the outbursts resulted in out of school suspensions. The
Case Conference Committee reconvened on April 17, 2018 after the third incident. The Case
Conference Committee suggested placing the Student on homebound instruction. A
representative from InSource who had been working with the family suggested a one-on-one
aide. The Case Conference Committee did not want to pursue that course. The Case Conference
Committee anticipated the Student returning to full days when the Student entered the third
grade.

25. The behavior plan the School had in place during almost all of the 2017-2018 academic
year clearly did not effectively improve the Student's behavioral functioning. No actual data
confirmed the School's repeated contention the student made progress throughout the course of
the year. In fact, the Discipline Report for that year showed he made no progress with the year
culminating in three out of school suspensions; one in March, one in April, and one in May of
2018. The incident on April 11, 2018 resulted in the Warren County Sheriff's Office being
summoned and a police report for battery. Instead of bringing in a skilled, experienced
behavioral analyst to assist in developing an effective behavior intervention plan, the School
maintained the same behavior plan the whole year in a general education classroom. First, in
December 2017, the School opted to place the Student on a shortened school day, then by April
of 2018, the School recommend a homebound placement.

26. Evidence and testimony showed that the Student's second grade general education
teacher had significant difficulties managing the Student's behavior. By her own testimony, his
teacher stated she spent much of the year in a "pregnant fog". In email communications, she

expressed confusion about the Student's intervention plan and frustration about the lack of or

inconsistent support she received. The second grade teacher's frustrations and confusion

regarding the Student's behavior interventions as well as the lack of support undoubtedly

contributed to some extent to the lack of efficacy of the behavior interventions attempted.

27. The Case Conference Committee reconvened on August 3, 2018 just before the

beginning of the third grade. The IEP again had behavior goals of return to task and self-

regulation of aggression identical to those IEPs since October 18, 2017 with no indication or

objective data showing any progress or lack of progress. The School began using a star chart

system to indicate time periods throughout the day the Student demonstrated three target

behaviors (keep hands to self, do work with one prompt or less, use my safe place or breathing

technique to calm my mind and body). The School did not aggregate the information from the

charts or perform any analysis of the information from the star charts relative to the Student's

continued severe aggressive outbursts. The School also began using tally sheets to track the

Student's behavior throughout the day, but, again, the School did not aggregate or analyze the

information from the tally sheets. The Student's third-grade special education teacher kept her

own record of incidents she observed. Several incidents the teacher recorded did not appear on

the tally sheets. All of the Student's services remained the same and he continued to have a full-

time general education placement. The Case Conference Committee maintained essentially used

the same behavior plan as used during the previous academic year with the addition of sensory

breaks, lunch choices and the star chart system.

28. At the August 3, 2019 Case Conference Committee meeting, the committee informed the

Student's parents that the School planned to begin charging the parents for any damages over

$50.00. Sometime in fall of 2018, the School filed a civil suit against the parents in small claims

court to collect money for damages. The School settled the civil court case during these due
process hearing proceedings.

    29. Between August 15, 2018 and September 26, 2018, the Student had nine significant
behavioral incidents involving physical aggression and property damage. Two of the nine
incidents resulted in out of school suspensions. No evidence showed any substantive changes to
the Student's behavior plan.

    30. During a meeting on August 30, 2017 with key personnel involved with the Student, the
Superintendent in a written summary of the meeting stated "I clearly stated a 1 on 1 aide was not
an option and I would never even allow mention of that in an IEP". The Superintendent did not
participate in any of the Case Conference Committee meetings. However, the other school
personnel at the meeting included the school principal, one of the Student's teachers, and the
Instructional Specialist, all of whom participated on the Student's Case Conference Committee
meetings.

    31. Under the Least Restrictive Environment section of all the Student's IEPs since first
grade placed him in full time general education placement. The Case Conference Committee
only considered Option 51, which would be placement him in a Resource Room with 40-79%
involvement in the general education setting. The Case Conference Committee rejected that
placement because they deemed it too restrictive and would not allow access to his peers as
needed.

    32. Much evidence and testimony surrounded the question of whether the School should
have provided the Student a one-on-one aide. The Student had a one-on-one aide provided
through the local mental health center that had a contractual arrangement with the School. The
parents discontinued those services because the Student made frequent complaints to his mother

about the one-on-one aide. Outside providers had conflicting opinions about whether the Student

would benefit from a one-to-one aide. His physician, a psychologist who reviewed the Student's

records, a therapist who conducted an independent psychological evaluation, and the

representative from InSource, all recommended a one-on-one aide. The School recommended

against it. School personnel asserted a one-on-one aide would increase the Student's stress level

and be counterproductive.

33. The School relied exclusively on the Student's parents to provide them information

about the student's medications, medication changes, and adverse effects. No School personnel

had any direct contact with any of the Student's medical providers to obtain information about

the medications, reasons for the medication changes, adverse effects, the validity of the

perceived associations between behavior fluctuations and medication changes, or supports school

personnel might put into place to help mitigate adverse medication effects.

34. The Advanced Nurse Practitioner (ANP) with the local community mental health center

who has managed the Student's medication since April of 2018 explained the medications the

Student had taken since she first began working with him and clearly explained the reasons for

each medication change. The ANP did not recall talking with any school personnel. She

obtained all information about the Student's behavioral issues from the Student's mother.

However, by her own testimony, the ANP would welcome the school nurse to sit in on the

Student's appointments and would be willing to contact the school nurse after she had

appointments with the Student to discuss his medications.

35. Despite references to the Student's medications and associations between medication

changes and behavioral issues in almost all the Student's IEPs, the school nurse did not

participate in any Case Conference Committee meeting or provide any consultative services

about the student's medication.

36. The Student's mother participated in every case conference committee meeting. She had
frequent contact with school personnel since the Student entered Williamsport Elementary
School in Kindergarten. His mother completed numerous behavior rating scales and checklists
as part of the evaluations the Student had.

## CONCLUSIONS OF LAW

1. The Indiana Department of Education properly assigned the Request for Due Process
Hearing to this IHO pursuant to IC 4-21.5 *et seq.* and 511 IAC 7-45-3, establishing the authority
of the IHO to hear and rule upon all matters presented.

2. All Conclusions of Law that can be deemed Findings of Fact are hereby deemed
Findings of Fact. All Findings of Fact that can be deemed Conclusions of Law are hereby
deemed Conclusions of Law.

I.    **Whether Respondent devised appropriate IEPs for the Student consistent with
      provisions of 511 IAC 7-42-6 reasonably calculated to provide a meaningful
      educational benefit.**

      No.

      1.  Despite 37 significant behavioral incidents of physical aggression and property

          damage during the 2017-2018 academic year, many resulting in out of school

          suspensions and one resulting in a police report for battery, the School made no

          changes to the Student's behavior plan in his IEP. The same is true in the fall of

          the 2018-2019 academic year, during which the Student had nine significant

          behavioral incidents between the beginning of the school year and the date the

          parents filed the Due Process Hearing request. The School did not change the

Student's behavior intervention plan in any substantive way since October 18,
2017.

2.  The Case Conference Committee kept identical behavioral goals in every IEP
    since October 18, 2017. The goals had no objective baseline data to determine
    whether the Student actually progressed toward reaching the goals. Given the
    Student had 37 significant incidents involving physical aggression and property
    damage during the 2017- 2018 academic year and nine between August 15 and
    September 26, 2018, it would be reasonable to conclude the behavior plan the
    School had in place did not effectively address the Student's behavior.

3.  The School repeatedly made associations between the student's behavior and his
    medications. However, because the School had no direct interaction with the
    health care providers involved in his medications, the School had no way of
    substantiating the presumed association. The school nurse never attended any
    case conference committee meeting and provided no consultative services.

4.  Despite the severe behavioral incidents, the School did not pursue consultation or
    involvement of an experienced, skilled, independent behavioral analyst to help
    devise an effective behavior intervention plan that included objective monitoring
    of the Student's behaviors.

5.  The School continued to keep the Student in a full-time general education
    classroom with only minimal increase in direct services by a special education
    teacher in a special education classroom during the 2017-2018 academic year. In
    April 17, 2018, the Case Conference Committee recommended changing from a
    shortened school day to homebound instruction, yet planned to and did put him in

30

the third grade in a full-day full-time general education classroom. Such planning

defies logic.

6. The School began using daily star charts and tally sheets in the Fall of 2018.

However, there was no indication that anyone compiled the data from those

records and provided the information in any usable form to the Case Conference

Committee.

7. School personnel expressly told the parents at the August 3, 2018 Case

Conference Committee meeting the School planned to charge them for any

property damage exceeding $50.00. Such an intent documented in the IEP

completely contradicts a fundamental underlying premise of a free appropriate

public education.

**II.     Whether Respondent ensured the availability of a continuum of placement options in the least restrictive environment consistent with 511 IAC 7-42-10(b)(4).**

No.

1. The Student's Case Conference Committee kept the Student in a full-time general

education placement since at least the first grade. The Student received minimal

direct instruction from a special education teacher. Even when the Case

Conference Committee placed the Student on a shortened school day, they still

kept the Student in a full-time general education placement.

2. The School did not consider a change of placement until the April 17, 2018 Case

Conference Committee meeting at which time they recommended homebound

instruction.

31

3. The Superintendent expressly prohibited even the mention of a one-on-one aide in the Student's IEP. Even though the Superintendent did not attend any of the Student's Case Conference Committees, the highly probable impact of his emphatic stance on the matter on the Case Conference Committee members who attended the meeting with him cannot be overlooked.

4. Even when the Student had so many significant behavioral disruptions during the 2017-2018 academic year, the IEPs reflected no indication of considering anything other than a full-time general education placement.

## III.  Whether Respondent appropriately determined the least restrictive environment for the Student consistent with 511 IAC 7-42-10(a).

No.

1. From October 18, 2017 through August 3, 2018, the Case Conference Committee went from having the Student in a full-day, full-time general education placement, to a shortened day, full-time general education placement, to recommending homebound instruction, to placing the Student in a full-day, full-time general education environment.

2. Other than shortened days and homebound, the only other option the Case Conference Committee considered was placement in a Resource Room with 40-79% in the general education setting. The School consistently rejected that option because they deemed it too restrictive and would decrease access to his peers. Yet, the Case Conference Committee recommended homebound instruction, which would completely restrict access to his peers.

32

3.  Pursuant to 511 IAC 7-42-10(a)(1), students with disabilities are to be educated
    with nondisabled peers to the maximum extent appropriate. However, 511 IAC 7-
    42-10(a)(2) states the following: "Special classes, separate schooling, or other
    removal of students from the general education environment occurs only if the
    nature and severity of the disability is such that education in general education
    classes using supplementary aids and services cannot be satisfactorily achieved."
    While in the full-time general education placement during the 2017-2018
    academic year, the Student had 37 serious incidents of physical aggression and
    property damage. The incidents frequently required physical restraint to prevent
    harm to the Student or others. By the end of that school year, the incidents had
    become so violent the student caused physical injuries to several staff members
    and the School called in the county sheriff. Despite that, the School placed the
    Student back in a full-day, full-time general education classroom when the
    Student entered the third grade in Fall of 2018. The Student then had nine more
    significant behavioral incidents of physical aggression between August 15, 2018
    and September 26, 2018. Although commendable that the School is committed to
    keeping the Student with his non-disabled peers, the Discipline Reports show that
    neither that placement nor the supplementary supports and services provided does
    not work for this Student at this time.

IV.   **Whether Respondent appropriately provided special education and related
      services to the Student consistent with and pursuant to 511 IAC 7-42-10(b).**

      No.

33

1. Although the School went to great lengths to ensure the Student participated in academic and nonacademic educational programs with his nondisabled peers, the Student only received at most 30 minutes per day of special education instruction from a special education teacher. The School did not consider any other options for the student except a full-time general education placement, even though other options such as placement in a resource room, for example. Such a placement would have provided the Student interventions by special education teachers and support staff specifically trained to provide the supports necessary to help the Student develop the skills needed to participate successfully with his peers.

2. The shortened school day and most certainly homebound decreases or eliminates opportunity for the Student to interact with nondisabled peers.

3. The numerous out of school suspensions resulting from continued severe behavioral outbursts substantially separates the Student from his nondisabled peers.

**V.    Whether Respondent appropriately conducted a Functional Behavioral Assessment consistent with 511 IAC 7-32-41.**

No.

1.   Unlike psychoeducational evaluations, Article 7 does not contain specific component requirements for Functional Behavior Assessments. However, 511 IAC 7-32-41 states a Functional Behavioral Assessment "means a process that uses data to identify patterns in the student's behavior and the purpose or function of the behavior for the student." The FBA the school conducted on December 2, 2015 did just that. The School psychologist used a thorough structured process that included, among other methods, detailed, structured observations by

34

numerous observers who recorded antecedents, behaviors, and consequences of

the Student's behaviors. The school psychologist used the data collected to infer

the purpose or function of the behavior and produced a written FBA report that

had cogent, usable information. In contrast, the FBA conducted in October of

2017 included a parent interview and two checklists completed by two teachers.

There was no integration of the information, no determination of patterns in the

student's behavior, and no indication of the purpose or function of the behavior. .

**VI.    Whether Respondent appropriately devised and implemented a Behavioral
         Intervention Plan consistent with 511 IAC 7-32-10.**

No.

1.   Like the FBA, Article 7 provides does not contain specific required components

     for Behavior Intervention Plans. However, 511 IAC 7-32-10(a) defines BIPs as

     follows:

     "Behavior intervention plan" means a plan agreed upon by the CCC and
     incorporated into a student's IEP that describes the following:
              (1) The pattern of behavior that impedes the student's learning or the
                  learning of others.
              (2) The purpose or function of the behavior as identified in a functional
                  behavior assessment.
              (3) The positive interventions and supports, and other strategies to:
                         (A) Address the behavior; and
                         (B) Maximize consistency of implementation across people and
                             settings in which the student is involved.
              (4) If applicable, the skills that will be taught and monitored in an effort to
                  change a specific pattern of behavior of the student. The behavior
                  intervention plan seeks to maximize consistency of implementation
                  across people and settings in which the student is involved.

2.   The BIP in place since October 18, 2017 has no description of the Student's

     pattern of behavior, no indication of the purpose or function of the Student's

     behavior, no connection to the Student's FBA, and no skills that will be taught.

The only component the BIP contains is poorly described positive interventions

and supports.

**VII.  Whether Respondent properly monitored and provided the Student's parent reports of the Student's progress toward goals in compliance with IAC 511 7-42-6(f)(3) and 511 IAC 7-42-8(b).**

No.

1.  The two behavior goals that have remained unchanged in the Student's IEP since

    at least October 18, 2017 contained no information or data that established a

    baseline by which to measure the Student's progress toward those goals.

2.  The School did not use any well-defined objective means of measuring the

    Student's progress toward the Student's behavior goals.  There was no indication

    the information from the star charts or tally sheets the School began using in fall

    of 2018 were compiled and incorporated into reports for the parents or used in the

    Student's IEPs.

3.  The progress monitoring assessment charts in the Student's IEPs remained

    completely unchanged in every IEP from October 18, 2017 through August 3,

    2018.  Even though the Student had 37 significant behavioral incidents involving

    significant physical aggression and property damage during the 2017-2018

    academic year, his progress monitoring charts did not change.  Clearly, the School

    did not incorporate the identified method for measuring progress (behavior chart

    and teacher observation) the information into the Student's IEP in any way.

**VIII. Whether Respondent properly provided the Student's parent the opportunity to meaningfully participate in the Student's Case Conference Committees in compliance with IAC 511 7-42-6(b)(2).**

Yes and no.

1.  The Student's mother attended every Case Conference Committee meeting. The
    notes in the Student's IEPs consistently reflected attentiveness and responsivity to
    the parent's concerns and input both generally and in the Case Conference
    meetings.

2.  The School included the Student's mother in the evaluation processes. She
    completed rating scales and checklists and participated in numerous interviews.

3.  The area in which the School did not allow the parents to meaningfully participate
    was the School's unilateral decision prompted by the Superintendent to essentially
    prohibit even entertaining the possibility of a one-on-one aide.

IX.   **Whether Respondent properly conducted an educational evaluation of the
      Student sufficiently comprehensive to identify all of the Student's special
      education and related service needs consistent with 511 IAC 7-40-3(e & f).**

      Yes and no.

      1.   The school conducted thorough well-done psychoeducational evaluation in
           December of 2017 and January of 2018. The evaluation incorporated findings
           from a private psychological evaluation conducted in the early summer of 2017
           reflecting the Student's cognitive ability. The evaluation included standardized
           assessment academic achievement, assessment of the Student's behavior at home
           and at school, clinical interview with the Student and his parents, assessment of
           adaptive behavior. The evaluation included social and development history, and
           educational history. The school psychologist conducted systematic classroom
           observations and clinical observations.

      2.   The October 2017 FBA presents the primary failure on this issue. At that time,
           the Student's behavioral issues had significantly worsened. The Student

37

desperately required a through, well-constructed FBA using well-established procedures that would provide meaningful, useful information to guide the development and implementation of an effective behavior intervention plan. Instead, the October FBA provided little useful information and the evidence showed no substantive indication the FBA was used in any way. This Student is only going to get bigger and stronger. An FBA using recognized, established procedures that guides a well-formulated BIP is essential to this Student's ability to avoid the potential placement in a residential academic setting.

3. By her own testimony, the OT did not conduct a comprehensive OT evaluation in September of 2017.

The totality of the errors the School made clearly shows the School failed to provide this Student a free appropriate public education. Moreover, the School's aggressive attempt to force the Student's parents to pay for property damage is nothing less than astonishing. It is incomprehensible the School failed to acknowledge or recognize that the destruction of property the Student caused during his many aggressive outbursts was so clearly a manifestation of his disability and rips at one of the fundamental cornerstones of providing students with disabilities a free appropriate public education.

## ORDERS

1. The School shall arrange and pay for the Student's ANP and the school nurse to participate in person at the Student's Case Conference Committee to convene no later than 30 days from the date of this Decision.

2. The School shall add the school nurse consultation as a related service to the Student's IEP. The school nurse shall attend all the Student's Case Conference Committee

38

Meetings.

3.  The school nurse shall have direct communication either in person or by telephone with
    the ANP after each of the Student's appointments with her. The school nurse shall be
    responsible for apprising the ANP of behavioral issues and successes the Student has
    demonstrated as well as conveying any concerns about potential side effects the Student
    may display.

4.  Within the 30 days from the date of this Decision, the School shall arrange for an
    inservice training to be provided by a skilled, experienced behavioral consultant for all
    school personnel involved with the Student. The inservice shall provide instruction on
    conducting a proper comprehensive functional behavior assessment, devising a BIP with
    clear, well-defined behaviors, implementing a BIP, and objectively monitoring the
    efficacy of the BIP.

5.  Within 45 days of the date of this Decision, the School shall arrange for an inservice
    training on writing objective behavioral goals, devising objective, effective means of
    establishing baselines for the goals, collecting and compiling data that can show progress
    or lack of progress, and incorporating the data into the IEP. The inservice shall have
    mandatory attendance for all school personnel, including administrators, who work with
    or are involved with special education students.

6.  On January 25, 2019, the School contracted a behavioral consultant to conduct an FBA
    and devise a BIP. The School shall arrange for that behavioral consultant or another
    similarly qualified behavioral specialist to work with School personnel in implementing
    the BIP he developed from the FBA. The School shall also work with the consultant or
    similarly qualified behavioral specialist to develop an objective means of collecting

39

objective data reflecting the student's response to the BIP. The School shall compile
those data and integrate the information in the Student's IEP.

7. Within 30 days of this Decision, the School shall write new behavioral goals that reflect
the findings of the January 25, 2019 FBA and BIP.

8. Within 30 days of this Decision, the School shall contract with a skilled, experienced,
independent behavior specialist to review the Student's records and this Decision and
participate in the Student's Case Conference Committee to assist in determining the
appropriate placement for this student, including, but not limited to, the amount of direct
instruction the Student receives from a special education teacher on academic and
behavioral skills.

## NOTICE OF RIGHT TO JUDICIAL REVIEW

Any party disagreeing with the decision of the independent hearing officer may file a
petition for judicial review with a civil court with jurisdiction. Under IC 4-21.5-5-5, a petition for
review by a state or federal civil court must be filed within thirty (30) calendar days after the date
the independent hearing officer's written decision is received by the party. The court shall:

(1) receive the record of administrative proceedings; (2) hear additional evidence at the
request of a party; and (3) grant the relief it determines to be appropriate, basing its
decision on a preponderance of the evidence.

A party may file an action for attorney's fees. Such action for attorney's fees must be
filed in a civil court within thirty (30) calendar days after receipt of the independent hearing
officer's final decision if no request for judicial review is filed.

M Nichols Dilk Ph.D.J.D.

M. Nichols Dilk, Ph.D, J.D.
Independent Hearing Officer

40

HR-033-2019                                                               03-30-2019

Distribution:

Catherine Michael
Hollingsworth & Zivitz
11555 North Meridian Street, Suite 530
Carmel, Indiana 46032

Monica Conrad
Lewis Kappes
8585 Broadway, Suite 610A
Merrillville, Indiana 46410

Kim Peyton
IDOE
115 West Washington Street
South Tower Suite 600
Indianapolis, Indiana 46204

41